# EXHIBIT E

# ABBEY LANE QUILTS, LLC

## vs

## OWEN

## COURT HEARING

## February 12, 2018



333 South Rio Grande
Salt Lake City, Utah 84101
www.DepoMaxMerit.com

Toll Free 800-337-6629
Phone 801-328-1188
Fax 801-328-1189

**106**

1   A   Yes.
2   Q   Okay. And that was ostensibly because you
3   claim that somebody at the State of California said
4   you needed it for a tax -- or business tax license
5   for the State of California, correct?
6   A   Yes. They suggested we get one to make it
7   easier for them.
8   Q   Okay. And you hadn't needed one the prior
9   three years that you'd been (inaudible) California,
10  correct?
11  A   They were able to pull whatever information
12  they needed, but this year there was no information.
13  Q   And so then you went to the website and you
14  entered the information for Abbey Lane Quilts on
15  their website, correct?
16  A   What website?
17  Q   The California taxing authority's website
18  when you got your temporary tax license.
19  A   Yes.
20  Q   You went on the website to do it, right?
21  A   Yes.
22  Q   And the website has a series of fill-ins
23  where you put the name of the company, the address,
24  things like that, and then you get to a drop-down
25  where it asks you to put your business entity in the

**107**

1   drop-down, does it not? What type of business entity
2   you are.
3   A   Okay.
4   Q   Do you remember this?
5   A   Well, I remember going -- they were walking
6   me through it.
7   Q   Maybe this will help you recall.
8   A   I would assume that.
9   Q   Ma'am, I've handed you what's been marked
10  as Exhibit 5 -- or Defendants' Exhibit 5 for
11  identification. Does that look like the website that
12  you went to to enter the Abbey Lane Quilts
13  information for the California Department of Tax and
14  Fee Administration?
15  A   I suppose so.
16  Q   Okay. It doesn't look familiar to you?
17  A   It was a long time ago.
18  Q   Okay.
19  A   I look at a lot of pages on the Internet.
20  Q   Okay. Well --
21  A   So I assume it was.
22  Q   Does that not have a drop-down that has a
23  different type of business entities, such as
24  corporations, estate --
25      MR. RUDD: Your Honor, I'm just going to

**108**

1   object, really, as to relevance here, because it
2   appears counsel is putting a blank form in front of
3   the witness and -- so there's no information filled
4   into it, so --
5       THE COURT: Well, the problem is, she said,
6   "I don't know anything about this," so it probably
7   gets beyond that hurdle. Yeah, it's --
8       MR. RUDD: And there's no foundation to
9   this form. I mean, we haven't --
10      THE COURT: Right.
11      MR. RUDD: -- really laid a foundation. I
12  will stipulate that it appears to be from
13  california.gov, but other than that, it --
14      THE COURT: But unless she's never seen it
15  before --
16      MR. RUDD: Correct.
17      THE COURT: -- it wouldn't make any
18  difference, so --
19  Q   (BY MR. FARRELL) So it's your claim you've
20  never seen this -- this screenshot of this --
21  A   No. I -- I don't -- I assume it is. As
22  you're going through all of these, they kind of all
23  look alike, but yes.
24  Q   Okay. Okay. Now, you've claimed that all
25  patterns, designs, products, website were created

**109**

1   through Abbey Lane Quilts. Am I correct in that
2   assertion?
3   A   Yes.
4   Q   Okay. You'd agree that they were not
5   created by Abbey Lane Quilts, LLC, correct?
6   A   They belong to Abbey Lane Quilts.
7   Q   Are you claiming they belong to Abbey Lane
8   Quilts, LLC?
9   A   I think they're the same thing.
10  Q   Okay. Well, regarding this LLC, now, you'd
11  agree that Abbey Lane Quilts, LLC would not have been
12  able to create any designs, any product, or any
13  websites or anything of that manner until it was
14  actually constituted on December 21st of 2017? You'd
15  agree with that, would you not?
16  A   Can you repeat that for me?
17  Q   Sure. Sure. Abbey Lane Quilts, LLC does
18  not get created until December 21st of 2017? You'd
19  agree with that, right?
20  A   2016.
21  Q   Of '16. I'm sorry. December 21st, 2016 is
22  the first time Abbey Lane Quilts, LLC has ever -- any
23  paperwork is ever filed for that, correct?
24  A   Yes.
25  Q   So at that point in time is the first time

**Page 110**

1  it's ever been created, so all the patterns and
2  everything that's been done before then was all Abbey
3  Lane Quilts, correct, in your testimony?
4     A   Yes.
5     Q   Okay. Because there's no way Abbey Lane
6  Quilts, LLC could have created anything before it was
7  even in existence, right?
8     A   Right.
9     Q   Okay. Now, you also claim that Abbey Lane
10 Quilts never wrote a check or gave any money to Lone
11 Star Promotions; is that correct?
12    A   Yes.
13    Q   Okay. You were aware of Lone Star
14 Promotions, though, right?
15    A   Marcea had told me about Lone Star.
16    Q   Okay. She told you about that back in
17 2008, correct?
18    A   Right. She told me it was a bogus company
19 that she was using to write off her camera equipment
20 when she took pictures for Abbey Lane.
21    Q   Okay.
22    A   Had nothing to do with Abbey Lane.
23    Q   Okay. Well, she didn't tell you that that
24 is how -- and you created a company called "Quilted
25 Stitch By Stitch," correct?

**Page 111**

1     A   I had started that, but once we started
2  Abbey Lane, I didn't do anything with it. It was a
3  company that was for quilting.
4     Q   Okay. And you never did anything with it?
5     A   No.
6     Q   But you renewed your business license up
7  until 2012, didn't you?
8     A   I don't remember whether I did. If you say
9  I did, I did. I never had a -- I never sold anything
10 to it. I never ran any money through it.
11        THE COURT: What is it?
12        MR. FARRELL: It's from Oviedo -- City of
13 Oviedo tax receipt. It shows that -- one through
14 2012 and then they declared it inactive in 2016.
15    Q   Ma'am, I've handed you what's been marked
16 as Defendants' Number 6, and that's from the Oviedo
17 Tax Department --
18    A   Okay.
19    Q   -- for Quilted Stitch By Stitch.
20    A   Okay.
21    Q   Does that indicate that you had a business
22 license through two thousand -- or renewed the
23 business license through 2012?
24    A   I -- it looks like I did renew a business
25 license.

**Page 112**

1     Q   Okay. And so you actually did have that
2  business through 2012, correct?
3     A   I had a business license.
4     Q   Okay. And when you and Ms. Owen began
5  Abbey Lane Quilts, the division of labor was going to
6  be that Ms. Owen would do creative, and then you
7  would do quilting and back office, and Ms. Owen would
8  be doing the designs, preparing technical directions,
9  things like that, correct?
10    A   Not quite in that manner, no.
11    Q   But there would be a separation of who did
12 what, correct?
13    A   There was input on most everything from
14 both of us.
15    Q   Okay.
16    A   It wasn't, "You do this and I do that and
17 there's no" --
18    Q   So it's your claim that you designed all
19 the patterns?
20    A   No, I did not design all the patterns.
21    Q   How many patterns did you design?
22    A   By myself, I don't think I designed any.
23    Q   Okay.
24    A   On the other hand, without -- Marcea,
25 without my input, did not design any by herself.

**Page 113**

1     Q   Okay. Now, you claim -- getting back to my
2  other question I started into, you claim that Abbey
3  Lane Quilts never gave any money to Lone Star; is
4  that correct?
5     A   Not that I'm aware of.
6     Q   Okay. You received all the checkbooks
7  back, though, right, after checks were written?
8     A   Yes.
9     Q   Ma'am, I'm handing you what's been marked
10 as Defendants' Composite Exhibit No. 7. What is that
11 document?
12    A   It looks to be copies of some checks.
13    Q   Okay. What does it say in the memo line?
14    A   "Lone Star."
15    Q   Okay. Was that a check from Abbey Lane
16 Quilts?
17    A   It was a check to Marcea Owen.
18    Q   Okay. And -- but it has "Lone Star" in the
19 memo line, does it not, ma'am?
20    A   It does, but once she cashes that check, I
21 don't know what she does with it.
22    Q   Okay. But she was -- Lone Star was an LLC
23 that she operated, correct?
24    A   Yes.
25    Q   Okay. And the amount --

**Page 134**

1  about it.
2  Q   Because you didn't talk to her?
3  A   I don't recall her talking to me, either.
4  Q   You knew that if Abbey Lane Quilts did not
5  go to Market in May of 2017, that that would look bad
6  on Abbey Lane Quilts, would it not?
7  A   Not necessarily. There's always
8  emergencies into why people have to cancel their
9  shows.
10 Q   Okay.
11 A   It is not unheard of.
12 Q   But it doesn't look good, does it?
13 A   If it's an emergency or if it's something
14 out of the control, it doesn't matter.
15 Q   And then Ms. Owen shows up by herself.
16 When -- does she have to leave the booth alone when
17 she goes to the restroom?
18 A   We've always taken someone with us.
19     MR. RUDD: Your Honor, I'm sorry.
20 (Inaudible) we're talking about the witness using the
21 restroom.
22     THE COURT: Yeah. I think we've beat this
23 to death, Mr. Farrell. I've heard -- we've been down
24 this road two or three times. Let's get on to
25 something else. Can we?

**Page 135**

1     MR. FARRELL: Okay.
2  Q   All right. Now, Abbey Lane Quilts, LLC --
3  I believe it's your position that Abbey Lane Quilts
4  converted from a partnership into an LLC in December
5  of 2017. Is that your position?
6  A   I know I filed the papers for an LLC, yes.
7  Q   But other than filing these articles of
8  incorporation on December 21st of 2016, you did not
9  do anything in furtherance of this LLC, did you?
10 A   No, I did not.
11 Q   Okay. There's no purchase agreement
12 between Abbey Lane Quilts and Abbey Lane, LLC,
13 wherein Abbey Lane Quilts, LLC buys the assets of
14 Abbey Lane Quilts, is there?
15 A   No.
16 Q   Okay. There's no purchase agreement from
17 Abbey Lane Quilts, LLC purchasing the partnership
18 assets or the partnership of Marcea Owen, is there?
19 A   No.
20 Q   Okay. There's no written agreement between
21 Abbey Lane Quilts whatsoever and Abbey Lane Quilts,
22 LLC, is there?
23 A   No.
24 Q   Okay. There's no tender of any monies from
25 Abbey Lane Quilts, LLC to Abbey Lane Quilts, is

**Page 136**

1  there?
2  A   No.
3  Q   Okay. There was never any agreement by
4  Abbey Lane Quilts, LLC to undertake the liabilities
5  of Abbey Lane Quilts, is there?
6  A   No.
7  Q   By the way, when Abbey Lane Quilts, LLC
8  came up for renewal in May of 2017, you didn't even
9  file that, did you?
10 A   At the time, I was blocked out of
11 everything.
12 Q   Okay. You weren't blocked out of the State
13 of Florida website, were you, ma'am?
14 A   No.
15 Q   Okay. But -- so you didn't file that, did
16 you?
17 A   No. I was not doing anything with Abbey
18 Lane Quilts at the time.
19 Q   Okay. You don't have any written agreement
20 with Ms. Owen regarding the formation of Abbey Lane
21 Quilts, LLC, do you?
22 A   No. I think we've already gone over this.
23 Q   You have no written plan of conversion of
24 Abbey Lane Quilts to Abbey Lane Quilts, LLC; is that
25 correct?

**Page 137**

1  A   Yes.
2  Q   You have no written plan that includes the
3  name and form of the company of Abbey Lane Quilts
4  before the conversion to an LLC, do you?
5     MR. RUDD: Can you ask that again? I'm
6  sorry.
7  Q   (BY MR. FARRELL) There is no written plan
8  which includes the name and form of the company of
9  Abbey Lane Quilts before the conversion to Abbey Lane
10 Quilts, LLC, do you?
11 A   There is nothing, no.
12 Q   No written plans whatsoever, right?
13 A   Right.
14 Q   Okay. No written plan or documents that
15 establishes the terms and conditions of the
16 conversion of Abbey Lane Quilts partnership to Abbey
17 Lane Quilts, LLC?
18 A   Yes.
19 Q   You never filed a certificate of conversion
20 with the State of Florida, did you?
21 A   No.
22 Q   You never changed the identity of Abbey
23 Lane Quilts to Abbey Lane Quilts, LLC with any of the
24 vendors or distributors, did you?
25 A   No. They were the same thing.

## Page 138

1  Q  There was never any written agreement that
2  Abbey Lane Quilts, LLC would succeed Abbey Lane
3  Quilts, is there?
4     A  No.
5     Q  And, really, the only reason you did the
6  formation of the LLC was because you thought
7  California required this for the registration to the
8  Road To California, right?
9     A  Yes.
10    Q  Okay. It was for no other purpose, right?
11    A  Yes.
12    Q  Okay. Now, as far as when you all would
13 create quilting patterns, you'd agree that sometimes
14 the quilting patterns, you would allow members of the
15 public, friends, people at the quilt- -- local
16 quilting stores to look at the patterns before they
17 were in their final form, would you not?
18    A  It was more like a focus group, yes, to get
19 their opinions on.
20    Q  Okay. But these were people that were
21 outside of Abbey Lane Quilts, right?
22    A  A very small circle.
23    Q  Okay. Were they ever given any type of
24 confidentiality agreements?
25    A  No. I think it was understood that these

## Page 139

1  were not in their final form.
2     Q  Okay.
3     A  And that we were going to introduce them as
4  new patterns.
5     Q  Okay. Did vendors ever complain to either
6  you or Ms. Owen regarding checks not being deposited
7  in a timely manner?
8     A  Yes. There was one instance.
9     Q  Okay. Was there also an instance where a
10 vendor complained that they had $12,000 worth of
11 payables, but they never received an invoice from --
12       MR. RUDD: Your Honor, I'm going to object
13 on a relevance standard. I can't see how this is
14 applicable to a Rule 65(a) preliminary injunction,
15 but I guess counsel can respond.
16       THE COURT: Go ahead.
17       MR. FARRELL: It is relevant, Judge, in the
18 fact that we're talking -- there's -- we've got the
19 LLC. That -- I think that's -- that's a red herring.
20 But the -- as far as the good name of the company,
21 the fact that Ms. Owen -- or Ms. Liljenquist is
22 allowing payables and allowing these vendors to think
23 that there's poor bookkeeping really tarnishes the
24 good name of Abbey Lane Quilts, and to require
25 Ms. Owen to go back into business with

## Page 140

1  Ms. Liljenquist when she can't do these rudimentary
2  bookkeeping operations really is the harm that's
3  going to incur to Ms. Owen.
4        THE COURT: You know, I -- I mean, I
5  understand the argument, but I just feel like we're
6  getting so far afield. We're not here to try the
7  case, although I feel like we have. I mean, this is
8  a preliminary injunction. You asked for a half a
9  day. I have a feeling we're not even close to
10 finishing.
11       MR. FARRELL: Well, Judge, I mean, the --
12       THE COURT: I just feel like we need to
13 focus on one issue, and that's the issue of the
14 preliminary injunction. I'm not here to -- I'm not
15 the trier of fact. I'm not going to make a ruling on
16 the bottom line here, but I just feel like we are
17 just drifting so far afield.
18       MR. FARRELL: I understand, Judge, but part
19 of the harm -- because the -- in the four elements
20 here, we -- they've got to address irreparable harm.
21 I don't think they have. But I also do need to
22 address the other three elements of this, one of
23 which is what is the harm that would harm my client,
24 and this would harm my client if the Court were to
25 grant the injunction.

## Page 141

1        THE COURT: I just -- I don't see it. I
2  really don't. So I'm going to sustain the objection
3  at this point.
4        MR. FARRELL: Okay.
5     Q  When Ms. Owen had told some of the vendors
6  to have the checks delivered to her business address
7  here in North Ogden, that wouldn't have prevented
8  Abbey Lane Quilts from continuing to operate, would
9  it, ma'am?
10    A  Operating as it usually would, yes, it
11 would, but no.
12    Q  Because Ms. Owen was equally capable of
13 depositing checks, sending invoices, that type of
14 thing, correct?
15    A  Right. It made me nervous because of her
16 financial situation and how she continually took
17 money out without my authorization.
18    Q  Okay. Well, the only claim they -- of
19 money that you claim she took was $3,000 in early
20 2016 and $1,000. She paid back the $3,000, right?
21    A  Yes.
22    Q  And the $1,000, you claim she didn't pay it
23 back, but you ultimately recaptured it at the end of
24 the year?
25    A  Right.

**Page 210**

telling me something different, which makes the case very difficult, not just for the preliminary injunction but for the trial. It would have been so much easier had they sat down with a lawyer and drafted some kind of written agreement here, but it didn't happen, so -- and there's a lot of finger pointing between the two sides. You know, "You took money from the company without authorization." "Well, so did you," and back and forth. And, again, that's all for trial. I don't know that that has really much bearing on a preliminary injunction.

But as I read it -- and, again, I agree with Mr. Rudd. The purpose of Rule 65 is to preserve the status quo. I think that was right on the money. And that's how I read Rule 65, is that we're trying to freeze the assets. We're trying to keep things the way they were until we get to trial and resolve this case, and so, for that reason, I'm going to grant the preliminary injunction for the plaintiff.

Without going through all of the evidence, I'll find that the plaintiffs have met the four requirements that we have under Rule 65.

Now, as far as the relief, again, I'll grant your request for relief, Mr. Rudd. The only one I had any question about is number 6, that the

**Page 211**

decisions that are made have to be unanimous. I don't know -- is that going to be possible with these two?

MR. RUDD: Well, I think the request, your Honor, is just as a -- if it deviates from the general business that they've had for the last ten years, so if they want to go and sell cars -- they've been selling quilts -- that requires a unanimous decision.

THE COURT: Okay. But I'm just afraid you're never going to get these two to agree on anything, after listening to today, but -- all right. I mean, I'll -- I'll grant the relief the way you're requesting it, but I just -- I have some question as to whether that will ever succeed, so --

Now, Mr. Rudd, will you go ahead and prepare the order --

MR. RUDD: I will.

THE COURT: -- and submit that to Mr. Farrell? So --

MR. FARRELL: I mean, I -- Judge, I just -- I mean, I need to clarify here. Now, is the Court requiring Ms. Owen to work with Ms. Liljenquist?

THE WITNESS: Well, that's what I'm saying. That's my only hesitation. The idea is to put the

**Page 212**

business back where it is. As a practical matter, I don't know that they're capable of working together, so --

MR. FARRELL: Well, I mean, we could put the business back to where it was at the end of April of 2017, which was zero money and zero credit cards, and then we can work on the dissolution of the company regarding the various assets. That's -- that's my concern with this injunction, is that Ms. Liljenquist hasn't worked with this company in ten months. Ms. Owen has been working with a different company.

THE COURT: Right.

MR. FARRELL: And I understand the Court's concern. She can change the name of this new company to something that does not -- is not close to Abbey Lane and use a different name, but what I want to know is, is Ms. Owen going to be forced to work with Ms. Liljenquist in this company that has no money?

THE COURT: Okay.

MR. RUDD: Your Honor, we are -- she would -- let me clarify a little bit.

THE COURT: Okay.

MR. RUDD: If the Court would like to -- and maybe, you know, this is where the Court weighs

**Page 213**

the credibility of the parties, right? I mean, that's what the Court is really doing today. If the Court would like and they want to put more decision-making authority with Ms. Liljenquist since for ten years she's handled the books, we can put some parameters in there that any revenue over $20,000 will be -- you know, can be distributed, but, you know, they're not forced to be in the same room together. They're not forced to work together. This certainly isn't indentured servitude. As you heard, these patterns have five-year lives and things. I mean, revenue is going to be coming in. As long as the defendant would be receiving her 50 percent share through the pendency of this action, then I don't think she'd be harmed when we're looking at the status quo.

I understand the Court's concern about, you know, unanimous decision. I would welcome if the Court would want Ms. Liljenquist and give Ms. Liljenquist some specific parameters that, you know, she's to make sure her decisions are in the best interests of Abbey Lane. She needs to take Ms. Owen's, you know, ownership interest into consideration. But there's been no pattern that she hasn't done that.

**214**

1  THE COURT: Well, my impression is what
2  you -- what you really want is that everything go
3  back into the original company, right?
4      MR. RUDD: Correct. Status quo.
5      THE COURT: And that I've granted. But
6  what I'm hesitating to do is asking them to work
7  together. It's not going to work. Neither one of
8  them want to work with each other. They've made that
9  very clear. So I'm trying to figure out, how do we
10 do this? I'm obviously going to keep the preliminary
11 injunction in place --
12     MR. RUDD: Okay.
13     THE COURT: -- and so there's no selling,
14 there's no drawing money down, there's no -- without
15 approval from both sides --
16     MR. RUDD: Okay.
17     THE COURT: -- so there's nothing going on
18 behind the scenes, so I don't know how you want to
19 word that, but --
20     MR. FARRELL: And I think the other
21 question I have is how does -- how does this company
22 operate when we've got six years of back -- back
23 business taxes that need to be paid?
24     THE COURT: Again, that's an issue for
25 another day.

**215**

1      MR. RUDD: Correct.
2      THE COURT: I don't think that has any
3  bearing on the -- I understand the concern, but I
4  don't think it's an issue that interferes with the
5  preliminary injunction. What I -- what I got out of
6  all of this is we want to go back to square one when
7  the business was in place, decisions were being made
8  by both of them together, as far as who they're
9  selling to, how much they're drawing. That's the
10 idea, so -- I mean, if you need a third party to make
11 the decision -- if -- you know, if Ms. Owen wants to
12 talk to you and you talk to Mr. Rudd, that's fine.
13 You know, I don't know that they have to communicate
14 with each other. Maybe they want to do it through
15 the attorneys rather than --
16     MR. FARRELL: But -- and the other aspect
17 of this is that -- I mean, where is the line drawn?
18 Is it pre-April 2nd of 2017 or is -- are we going
19 back to everything that Ms. Owen has done for the
20 last ten months goes to Ms. Liljenquist?
21     MR. RUDD: It doesn't go to
22 Ms. Liljenquist, but it goes to the entity, because
23 at the end of the day, your Honor, the entity can
24 still be divided, it can be split, it can be sold,
25 there can be settlements, as long as the entity

**216**

1  controls, and I think the weight of the evidence is
2  that the entity is property.
3      THE COURT: Yeah. I -- go ahead and
4  prepare the order.
5      MR. RUDD: Thank you, your Honor.
6      THE COURT: I'll grant the relief and, you
7  know, you'll just have to do what you can do.
8      MR. RUDD: Thank you.
9      THE COURT: Okay? All right. All right.
10 We've got all the exhibits here?
11     THE CLERK: I believe so, your Honor.
12     THE COURT: All right.
13     MR. RUDD: Thank you, your Honor.
14     THE COURT: All right. Thank you.
15     (Record closed and reopened.)
16     MR. FARRELL: ...pay Ms. Owen all the debts
17 that Ms. Owen has incurred to run --
18     THE COURT: Again --
19     MR. FARRELL: -- to Abbey Lane?
20     THE COURT: -- I think that's for another
21 day. That -- that's not what today is all about.
22 Today is about granting a preliminary injunction.
23 You can deal with all the details in the course of
24 discovery and motions and everything else, so -- I'm
25 not here today to decide that issue. Okay?

**217**

1      MR. RUDD: Thank you, your Honor.
2      THE COURT: All right.
3      (Record closed at 5:59 p.m.)
4              * * * *